UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
──────────────────────────────────────────X

UNITED STATES OF AMERICA,

    -against-                                        22 Cr. 360 (NSR)

CONRAD LEWALLEN,

                         Defendant.
──────────────────────────────────────────X


**SENTENCING MEMORANDUM ON BEHALF OF
THE DEFENDANT CONRAD LEWALLEN**


                                                James E. Neuman, P.C.
                                               100 Lafayette Street, Suite 501
                                               New York, NY 10013
                                               (212) 966-5612

**Preliminary Statement**

This memorandum is submitted on behalf of Conrad Lewallen, whose sentencing is currently scheduled for September 5, 2024. Attached are the following exhibits: letters from Mr. Lewallen's friends and family (Exhibit A); a letter from Mr. Lewallen (Exhibit B); and some of the certificates he has earned during his confinement (Exhibit C). On June 29, 2022, Mr. Lewallen pleaded guilty, pursuant to a cooperation agreement, to thirteen counts: conspiring to distribute narcotics, in violation of 21 U.S.C. § 841(b)(1)(A) and (b)(1)(B) (four counts); discharging a firearm in furtherance of a drug conspiracy, in violation of 18 U.S.C. § 924©; conspiring to commit and committing Hobbs Act robbery, in violation of 18 U.S.C. § 1951 (two counts); conspiring to and using a cellphone to carry out an assault, in violation of 18 U.S.C. § 371 (two counts); selling firearms without a license, in violation of 18 U.S.C. § 922(a)(1)(A); possession of a firearm after committing a felony, in violation of 18 U.S.C. § 922(g); engaging in a scheme to file a fraudulent lawsuit, in violation of 18 U.S.C. § 1349; and stealing property from a common carrier, in violation of 18 U.S.C. § 659. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

**Personal background**

<u>Early life</u>

Mr. Lewallen, now 35 years old, was born and grew up in the area of Spring Valley, New York. He and his three siblings were raised primarily by his mother and maternal grandmother, who lived in the same household. During the times when his mother was working as a nurse and his grandmother was working at a factory, his paternal grandfather watched the children. Although Mr.

Lewallen was close to his mother, siblings, and grandparents, his father lived elsewhere. Until he was about ten years old, Mr. Lewallen saw his father only intermittently. PSR ¶ 126.

Further, when the father did visit the family, he was often drunk and physically abusive. He repeatedly assaulted Mr. Lewallen's mother, requiring other family members or the police to intervene. When Mr. Lewallen was about ten years old, his father actually moved into the family home; but because of his continuing drinking and abusive conduct, he was forced to leave. PSR ¶ 126. Meanwhile, Mr. Lewallen began to exhibit behavioral issues. He was diagnosed as "emotionally disturbed" and placed in special education classes. PSR ¶ 136. Around the same time, a younger brother, Shamar, started a life-long routine of being shuttled in and out of hospitals for his own psychiatric issues. Still, Mr Lewallen's childhood was not entirely unhappy. Among other things, he actively participated in various sports leagues. PSR ¶ 126. His mother recalls that he was helpful and attempted to set a good example for his siblings. Exhibit A (Angela Floyd letter). And while his parents occasionally punished him physically, he did not consider that to be abusive.

But Mr. Lewallen's behavior worsened in middle school. Exposed to a rougher crowd, he started smoking marijuana in the seventh grade, a habit he continued for years. PSR ¶¶ 127, 141. After being expelled for bringing a box-cutter to school, authorities filed a Person in Need of Supervision petition, resulting in his placement in a group home. His conduct at the group home, however, did not improve. Because he got into a number of fights, he was moved into a different facility. Following false allegations that he had set fire to a resident's room, he was moved to other facilities, pending adjudication. PSR ¶ 127.

Finally, Mr. Lewallen was sent to the Louis Gossett, Jr, Residential Center, a facility which would later become notorious for allegations of abuse. In fact, Mr. Lewallen witnessed and

personally endured considerable abuse there. He was deprived of food and the opportunity to use the bathroom. On occasion, he was restrained and dragged across carpets, causing burns to his body. And he witnessed guards break arms of other boys. When he was nearly sixteen years old and after spending two years at the Lois Gossett center, he was released and returned to live with his mother. PSR ¶ 127.

Glad to be home, Mr. Lewallen's behavior initially improved. PSR ¶ 127. But he continued to smoke marijuana and also started drinking 3-4 beers every day. PSR ¶¶ 141-42. Eventually, he was expelled from school in the 10th grade for fighting. PSR ¶¶ 127, 144. Thereafter, he received tutoring at a library for a few months, but did not obtain his high school degree. Around this point, he fathered his first child. In the ensuing 6-7 months, he moved into an apartment with his child and the mother. Though he was only a teenager himself, he reportedly did his best to fulfill the role of a father. Exhibit A (Angela Floyd letter).

But in April, 2007, when he was eighteen years old, Mr. Lewallen was arrested and charged with unlawful imprisonment in the first degree and assault in the second degree. Later that year, he was arrested in separate incidents with robbery in the first degree and assault in the second degree. For all of those charges, he was sentenced in 2008 to concurrent terms, the most serious being a nine year sentence. PSR ¶¶ 113-115. While in jail the next year, he married a childhood friend, Laquaundo Pearson; but the strain of his incarceration caused them to separate six months later. PSR ¶ 128. During his incarceration, he received his GED, as well as taking courses in plumbing and masonry. PSR ¶ 144.

About six months before he was released, Mr. Lewallen's brother Savion was tragically murdered. Already suffering with untreated depression, Mr. Lewallen became particularly distraught

-3-

over Savion's death. Unable to attend the funeral, he would always feel that he had been deprived of the opportunity for "closure." And he deeply regretted missing out on the last nine years of Savion's life. Notably, while Mr. Lewallen attended some classes in anger management and substance while incarcerated, he never received or sought treatment for his depression. PSR ¶ 137. For he had seen how psychiatric medication had turned his other brother, Shamar, into a "zombie" and caused him to gain extreme weight. So Mr. Lewallen elected to cope with his depression without assistance. PSR ¶ 138; Exhibit A (Angela Floyd letter).

When he was released from prison in 2016, Mr. Lewallen moved back into his mother's home, completed a number of drug treatment programs, and found regular employment. PSR ¶ 143. Between 2016-2019, he worked full-time at various establishments, including a number of restaurants, a hotel, UPS and BJ's Wholesale club. PSR ¶ 149. Thereafter, he worked one year at a nursing home. PSR ¶ 148. Subsequently, he worked for about eight months as a warehouse associate for Boar's Head in Pearl River, New York. PSR ¶ 147. Thus, from 2016 until the time of his arrest in early 2021, Mr. Lewallen was working full-time, though he never held any one job for more than a year.

During that period Mr. Lewallen also fathered three more children with two women. According to the letters from his family members, he was a dedicated, loving father. He saw all the children regularly and provided emotional and financial support to the mothers. Exhibit A (Angela Floyd letter; Vedeta Hanley letter). One mother, Tiona Powell, states in her letter that he also acted as a step-father to her other child from another relationship. She attests that he treated the children with patience and kindness, never raised his voice to them, and that they were his "pride and joy." Exhibit A (Tiona Powell letter). He even assisted his sister care for her own child. His sister recalls

in her letter that Mr. Lewallen "helped [her] tremendously in various aspects of [her] life, including advice, financial support, and caring for [her] seven-year old daughter." Exhibit A (Chantel Lewallen letter). In addition, he began a serious relationship with his current girlfriend, Imani Joseph, sometime in 2020. PSR ¶ 129; Exhibit A (Imani Joseph letter).

<u>The arrest and subsequent events</u>

Despite devoting time to his children and lawful employment, however, Mr. Lewallen also engaged in the offense conduct, described fully in the PSR. Although he ultimately pleaded guilty to multiple crimes, his initial charges were only for being a felon-in-possession of a firearm, and stemmed from a 911 call from a cab driver. Specifically, on October 29, 2021, the driver reported that three men in his cab possessed a gun. Eventually, the police met the cab driver, located the men, recovered a firearm and ammunition, and arrested Mr. Lewallen and the others.



Sometime in 2022, Mr. Lewallen was transferred to the Putnam Correctional Facility. While there, he finally recognized the need for professional help to deal with his mental health problems, which had plagued him most of his life. He asked for assistance and began to see a psychologist and psychiatrist regularly. He was eventually diagnosed and prescribed medication for unspecified mood disorder, unspecified anxiety disorder, and unspecified depressive disorder. PSR ¶ 138. He also dedicated himself to taking as many courses as possible in an effort to rehabilitate himself and prepare for re-entry into society. As of the date of this memorandum, he had completed over 70 self-study programs, including programs relating to: construction; carpentry; social studies; history; safe food handling; resume writing; digital marketing; careers without college; artificial intelligence; computer skills; business accounting; basic first aid; anger management; and substance abuse. PSR ¶¶ 143, 145; Exhibit C.

Moreover, Mr. Lewallen has endeavored to remain in close contact with his family. Although he is estranged from his oldest child, who is now 18 years old, he has maintained good relationships with his other three children and their mothers. PSR ¶ 130. He speaks with all of them regularly, either by telephone or during video-visits. He sees them in person whenever they are able to visit. And she speaks to his mother on a daily basis. PSR ¶ 124. Notably, all of his family report that he is truly remorseful for his crime and determined to improve his life, and they are confident that, whenever he is released, he will resume being an active, involved, loving father. Exhibit A (Imani Joseph letter; Angela Floyd letter, Vedeta Hanley letter).

Indeed, Mr. Lewallen has given considerably thought to planning for the future. He intends to live with his mother, so that he can assist her with dealing with multiple sclerosis. He wants to obtain steady construction work with a union, thereby earning enough to help all of his relatives.

Above all, he hopes to be present for his children and provide them with the kind of paternal support that he never enjoyed himself.

## POINT I

### THE DEFENDANT SHOULD BE SENTENCED TO TIME SERVED

The very first sentence of § 3553(a) declares that the court "shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph 2 of this subsection." § 3553 then directs the sentencing court to consider "the nature and circumstances of the offense and the history of the defendant," as well as the need for the sentence:

> "(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; © to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."

Among other factors that must be considered are "the kinds of sentences available," such as community service or home detention, (subsection 3), the sentencing guidelines (subsection 4), and the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar crimes (subsection 6). *See generally, United States v Salinas,* 365 F.3d 582, 589 (7th Cir. 2004). ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

To start with, we acknowledge that the offense conduct is serious. Insofar as the PSR thoroughly describes all of the conduct, a detailed recitation of that conduct here is unnecessary. But suffice it to say that Mr. Lewallen: distributed significant quantities of different types of narcotics

-7-

between 2009-2021; sold firearms between 2016-2021; fired a gun at someone in retaliation for the theft of marijuana in 2021; participated in robbing and assaulting a drug dealer in 2021; made false claims in connection with a lawsuit in 2017-2018; possessed a firearm after having been convicted of a felony; and stole cell phones in 2016. Collectively, such conduct was obviously extremely serious and dangerous.



In addition, while we agree with the guideline analysis set forth in the PSR, it bears noting that his criminal history score is based upon three convictions arising out of conduct that all occurred in 2007, when he was just eighteen years old and still engaged in considerable substance abuse.

Courts have recognized that criminal history scores may be overstated where, as here, the prior convictions were clustered together, occurred long ago, and happened when the defendant was young and suffering from drug addictions. *Compare, United States v Dickmann,* 2007 WL 442397 (E.D. Wis. 2007) (prior convictions were clustered during a time when the defendant's drug use caused him to spiral out of control); *United States v Mapp,* 2007 WL 485513 (E.D. Mich. 2007) (prior convictions occurred over 10 years earlier and within a two-year window when the defendant was in his teens); *United States v Wilkerson,* 183 F.Supp.2d 373 (D.Mass. 2002). To put it differently, Mr. Lewallen's history prior to this case is not as extensive as his criminal history score suggests. *See also, United States v McGhee,* 512 F.3d 1050 (8th Cir. 2008); *United States v Nowicki,* 252 F.Supp.2d 1242 (D.N. M. 2003);

 Moreover, all of Mr. Lewallen's criminal conduct can be attributed, at least in part, to a very difficult background. For most of his life, his father was essentially absent. But when he was home or visiting, he was often intoxicated and physically abusive to Mr. Lewallen's mother. Repeatedly, other family members had to intervene. At times, the police were called. Although Mr. Lewallen was not personally abused by his father, his exposure to such violence and substance abuse – starting when he was just in grade school and continuing through his teens – surely had a profound impact upon his development. At a minimum, the absence of paternal oversight and guidance made him more susceptible to crime. *See, United States v Bannister,* 786 F.Supp. 2d 617, 642 (E.D.N.Y. 2011 (noting how lack of male parental guidance is a known contributor to crime); Cobb-Clark & Tekin, *Fathers and Youths' Delinquent Behavior,* 12 Rev. of Econ. of the Household, 327 (2013) (same); *accord, Landrigan v Schriro,* 441 F.3d 638, 648 (9th Cir. 2006); *United States v Collington,* 461 F.3d 805, 809 (6th Cir. 2006); *United States v Bannister,* 786 F.Supp.2d 617. 642 (E.D.N.Y. 2011).

Further, when Mr. Lewallen was in middle school, he was personally subjected to physical and psychological abuse at the Louis Gossett Jr. Residential Center, an institution so notorious for poor conditions that it would become the subject of a 10-month investigation. While at that facility, Mr. Lewallen was often deprived of food and the opportunity to use the bathroom. On occasion, he was restrained and dragged across carpets, leaving burns on his body. And he witnessed guards breaking limbs of other children. For approximately two years – when he was at perhaps the most impressionable, formative age – Mr. Lewallen endured such conditions. As many courts have recognized, physical abuse can have long-term negative effects and is therefore a legitimate mitigating factor. *See e.g., United States v Walter,* 256 F.3d 891, 894 (9th Cir, 2001); *United States v Rivera,* 192 F.3d 81, 84 (2nd Cir. 1999) ("it seems beyond question that abuse suffered during childhood – at some level of severity – can impair a person's mental and emotional conditions," warranting a departure on the ground that such circumstances contributed to the commission of the offense); *Santosky v Kramer,* 455 U.S. 745, 489 (1982) (Rhenquist, J. dissenting) ("It requires no citation of authority to assert that children who are abused in their youth generally face extraordinary problems developing into responsible, productive adults").

Exposed to such abuse and lacking proper guidance from any male role model, it is not surprising that Mr. Lewallen began experimenting with drugs at a young age. By the time he was 13 years old, he was smoking marijuana regularly. A few years later, he was drinking alcohol every day. Meanwhile, he was shuttled from one youth facility to another, which only served to undermine any semblance of stability. He finally returned to his mother's home when he was about sixteen years old. But the "supervision" he had received in the prior years had not helped. He

continued to get into trouble and was eventually expelled from the 10th grade. Over the following 1 ½ years, he was arrested three times, leading to the imposition of a nine-year sentence.

Aside from the physical abuse, lack of paternal guidance, and use of drugs and alcohol, it is also apparent that Mr. Lewallen's history of untreated mental health conditions contributed to his criminal conduct. When still in grade school, he was diagnosed as "emotionally disturbed" and placed in special education classes; yet, he apparently received little to no counseling. When he was months away from completing his state sentence and being released, one of his brothers was murdered. As noted in the PSR and the accompanying letters, his brother's death and his inability to attend the funeral left him distraught; indeed to this day, he mourns his brother and feels that he was deprived of the opportunity for any "closure." But while he was plainly depressed, he never sought treatment. Having witnessed how medication had turned another brother into a "zombie," Mr. Lewallen was determined to cope with his mental health problems alone, rather than risk any doctor prescribing medication or hospitalization. In retrospect, though, the lack of treatment and counseling plainly made Mr. Lewallen more susceptible to committing crime.

Still, even while coping with a history of abuse, drug addiction, the absence of a father, and untreated mental health problems, Mr. Lewallen also exhibited some positive qualities as a young man. When he was about 17 years old, he fathered a daughter. During the following 7-8 months – until he was arrested on his state case – he lived with his daughter and the mother and did his best to help care for them. Years later – after completing his state sentence – he fathered three more children. According to his family, he embraced his role as father to all of them, saw the children regularly, and supported all of them financially. During this period (2016-2021), he offered similar assistance to his sister and her child. More recently, he has stayed in regular contact with his

children and their mothers since being arrested in 2021. The letters from his family make clear that they consider him to be a truly loving father, and they are eager to help him transition whenever he is released. *See generally, United States v Sayad,* 589 F.3d 1110 (10th Cir. 2009) (noting that strong family support aids rehabilitation).

Also notable is his history of employment. After his release from prison in 2016 up until the time he was detained on this case in 2021, Mr. Lewallen worked steadily. Among other places, he worked at restaurants, a hotel, a warehouse, and a nursing home. Although he never held any one of those jobs for more than a year, he managed to stay employed full-time throughout this period. Thus, the record indicates that he is willing and able to maintain lawful employment.

Moreover, Mr. Lewallen's conduct since his arrest on the current charges demonstrates that he is intent upon turning his life around and continuing to support his children. While at Putnam Correctional Facility, he sought out mental heath treatment for the first time, finally recognizing that he needed professional assistance. He was diagnosed with mood disorder, anxiety disorder, and depressive disorder. Thus, for about two years, he has been receiving counseling and medication for those problems, all of which he has found extremely beneficial. In addition, he has completed scores of self-study programs at the jail, including programs relating to: resume writing; digital marketing; careers without college; artificial intelligence; computer skills; business accounting; basic first aid; anger management; and substance abuse. The certificates attached as Exhibit C represent about half all the classes he has completed.

Simply put, since his arrest, Mr. Lewallen has done everything in his power to remain constructive, maintain good relationships with his family, improve his mental health, educate himself, and prepare for the future. His post-arrest rehabilitation is a significant reason for leniency.

*Pepper v United States,* 562 U.S. 476, 492-93 (2011) (discussing relevance of post-arrest rehabilitation); *United States v Williams,* 65 F.3d 301, 305 (2nd Cir. 1995); *see also United States v Munoz-Nava,* 524 F.3d 1137, 1149 (10th Cir. 2008); *United States v Baker,* 502 F.3d 465, 467 (6th Cir. 2007); *United States v Workman,* 80 F.3d 688, 701 (2nd Cir. 1996). And the heartfelt letter written by Mr. Lewallen (Exhibit B) is evidence of a man who has matured, recognized his shortcomings, accepted the need for help, and fully embraced the opportunity for a second chance.

Dated: New York, NY
August 22, 2024

/s/
James E. Neuman, P.C.
100 Lafayette Street
Suite 501
New York, NY 10013
(212) 966-5612